

## NUMBER 13-23-00160-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

EVA HERNANDEZ, AS NEXT
FRIEND OF JUAN HERNANDEZ,                               Appellant,

v.

WILFREDO CRESPO-VELEZ, M.D.,                            Appellee.

On appeal from the 444th District Court
of Cameron County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria
Memorandum Opinion by Chief Justice Contreras**

In this accelerated interlocutory appeal, appellant Eva Hernandez, as next friend

of Juan Hernandez, contends the trial court erred in dismissing her medical malpractice

suit against appellee Wilfredo Crespo-Velez, M.D. By two issues, Hernandez argues the

trial court abused its discretion by (1) finding that her expert report was deficient under

Chapter 74 of the Texas Medical Liability Act (TMLA) and (2) denying her a thirty-day extension to cure any deficiency before dismissing her claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (c). We reverse and remand.

## I. BACKGROUND

The underlying suit alleged that Juan Hernandez underwent heart surgery at Valley Regional Medical Center (VRMC) on November 14, 2020. On November 18 and 19, 2020, Juan developed ischemia in his left hand and left leg. Eventually, he developed thrombocytopenia—or low platelet levels in the blood—which resulted in the amputation of his left hand and parts of both feet. According to the lawsuit, the thrombocytopenia was induced by the continued administration of Heparin, an anticoagulant medication. The lawsuit alleged that the Heparin was ordered by several physicians, including Crespo-Velez, and that the physicians and hospital staff were grossly negligent because "they did not stop the Heparin" and "did not properly treat the Heparin-induced thrombocytopenia" and thrombosis (HIT or HITT).

Appellant, Juan's wife, sued VRMC on March 3, 2022. On September 2, 2022, she filed an amended petition adding Crespo-Velez and other physicians as defendants. On October 5, 2022, appellant served Crespo-Velez with an expert report and curriculum vitae of Robert L. Shuman, M.D., pursuant to the TMLA. *See id.* § 74.351(a). The report stated, in relevant part, as follows:

> Juan Hernandez presented to his cardiologist with chest pain on 11/12/20, and was referred to [VRMC] Emergency Room for evaluation of acute coronary syndrome. . . . He was found to have left main coronary artery disease of a severe nature and a cardiac surgical consult was obtained. Juan suffered from Diabetes Type II and morbid obesity. He was started on a Heparin drip and Dr. John Morales[,] a cardiac surgeon, saw him the following day and recommended surgery. Juan's platelet count on admission was 213,000. Dr. Morales performed surgery on Juan on

2

11/14/20. The [left anterior descending artery] and circumflex were performed off bypass, but the [posterior descending artery] was performed on cardiopulmonary bypass, and Heparin was obviously used for this part of the operation. . . .

On the following day, 11/15, his platelet count dropped to 77,000 at 16:55. On 11/16, the platelets were 72,000 and on 11/17 they were 54,000. On 11/17, a 250cc platelet transfusion was given to Juan for his low platelet count. On 11/18, his platelet count had risen to 123,000 and 128,000 due to the transfusions. . . . On 11/19, Juan's intra-aortic balloon pump was removed and his platelet count was 95,000. He was noted to have discoloration of his left hand and decreased motor movement. An ultrasound of his left upper extremity showed increased velocity in the left radial and ulnar arteries. A Heparin drip was instituted. The left hand was noted to be purplish and discolored with decreased movement and swelling. On 11/20, his platelet count was 120,000 and now Juan showed ischemia also in his left lower extremity. An emergency angiogram was performed, which showed very slow flow in the distal 2/3rds of his left arm and no flow beyond the wrist. He had decreased movements to his left toes. . . .

Juan was started on Argatroban[1] drip on 11/21, while the tests for HIT were awaited; his platelet count was 174,000. . . . On 11/22 he was found to be obtunded. His left upper extremity was purple with contractures. He had no pulses in the left radial or ulnar artery. The toes on the left side were purple. The HIT test was still pending. On 11/23, the medical records note that the HIT test was negative and his platelets were now 192,000. . . .

On 11/27, he developed a left pleural effusion and required a left chest tube. Because of the bloody nature of the fluid, Argatroban was stopped and they awaited demarcation of his hand and toes for amputation. On 11/27, an angiogram was performed and 3,000 units of Heparin were bolused. The angiogram showed that in the right upper extremity there was 100% occlusion of the right ulnar artery. In the left upper extremity there was no flow in the radial or ulnar arteries. In the left lower extremity there was a high-grade lesion in the superficial femoral artery, and that was angioplastied. A Heparin drip was then resumed following this angiogram. His platelet count on 11/27 was 71,000 and on 11/28 his count was down to 32,000. The Heparin drip was stopped and a 2nd HIT antibody test was sent and was reported as positive on 11/30 . . . .

On 11/29 the platelets rebounded to 50,000, and on 12/01 the platelets were 92,000. The HIT test was acknowledged as positive and they were awaiting demarcation of his left hand and feet. He subsequently underwent amputation with bilateral transmetatarsal amputations on 12/15,

---

[1] Argatroban is an alternative anticoagulant medication. *See Methodist Hosp. v. German*, 369 S.W.3d 333, 347 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

and an amputation of his left hand on 12/18. . . .

HIT is usually 5-10 days following exposure to Heparin. It is heralded by a precipitous drop in platelet counts; greater than 50%. This drop occurred on 11/15, when [Juan's] platelets dropped from 213,000 to 77,000 on the first post-operative day; which was on day 5 of Heparin exposure. The standard of care for this drop is to suspect HIT and stop all Heparin products. This was not done in this case. . . . . Both Dr. Jorge Guevara and Dr. Mark Bielefeld of the surgical service breached the standard of care by not stopping all Heparin and suspecting HIT when the platelet count dropped to 77,000. They also breached the standard of care by giving platelets on 11/17, in a patient who had suspicion for HIT. By 11/19, the left hand showed evidence of thrombosis and on 11/20, the left lower extremity showed evidence of thrombosis and HITT should have been highly suspected. . . .

*The breach in the standard of care also occurred when they resumed the Heparin drip after the angiogram on 11/27. This was allowed apparently by Wilfredo Crespo-Velez, M.D. and cardiologist Jaime Silva, M.D. It is a breach in the standard of care to use Heparin (3,000 u) during a procedure in someone who you highly suspect has HIT and has evidence of thrombosis. Despite the ongoing signs and symptoms of thrombosis in the left hand and lower extremities, Heparin was reused and the drip was restarted after the angiogram on the 27th with the usual result of a big drop in platelets. . . .*

Had the surgical and cardiac teams properly stop[ped] the Heparin and given Argatroban earlier and avoided re-introducing additional Heparin, Juan would have had a less serious case of HITT and would not have had to undergo the serious amputations that he has sustained. It is possible that even with proper care within the standard, Juan might have lost some fingers and toes[,] but to a reasonable degree of medical probability, the loss would have been substantially less.

(Emphasis added.) Crespo-Velez filed objections to the report and a motion to dismiss on October 26, 2022, arguing that Shuman's opinions "are conclusory and speculative" and that his report therefore does not comply with the statute's requirements.

After a hearing on April 6, 2023, the trial court sustained Crespo-Velez's objections but appeared to grant appellant's request for a thirty-day extension to cure the deficiency.

4

*See id.* § 74.351(c).[2] Nevertheless, the trial court subsequently signed an order on April 10, 2023, dismissing the claims against Crespo-Velez with prejudice and making no mention of a thirty-day extension.[3] Appellant then filed a motion for rehearing as well as a supplemental report by Shuman.[4] The trial court denied appellant's motion for

---

[2] After appellant's counsel asked for a thirty-day extension, the trial court replied:

Well, that's fine. You didn't want—I put that on the table earlier, but nobody took it, right? So the 30 days, that's fine with me. I don't care. But I can tell you from the perspective of the way things are, unless things are modified to that extent, that's the decision I have made.

[3] The trial court also denied a motion to dismiss filed by VRMC. Neither VRMC nor the other physician defendants are parties to this appeal.

[4] The supplemental report stated, in relevant part:

Mr. Hernandez received Heparin via IV, ordered by Dr. Crespo-Velez, from November 26 to November 28. This was a breach in the standard of care by Dr. Crespo-Velez to order Heparin for Mr. Hernandez. Mr. Hernandez had already shown clinical signs of HIT from November 15 to November 20, when he had a large drop in platelets following the administration of Heparin. The risk of HIT was known to Dr. Crespo-Velez. Dr. Crespo-Velez previously did not give Heparin due to concern for HIT. The risk of HIT was still present on November 26, 2020, when Dr. Crespo-Velez started the Heparin drip. The standard of care is that a physician should not introduce Heparin to a patient who is suspected to have HIT. . . . . Anytime you have HIT or a high suspicion of HIT, and you introduce further Heparin, it will cause more damage. Dr. Crespo-Velez should not have ordered Heparin on November 26. Dr. Crespo-Velez also should have stopped the Heparin and ordered a HIT test on November 27, when the platelets dropped to 71. This was a large drop from the previous day and is due to HIT. The Heparin was allowed to continue for another day and was not stopped until November 28, when the platelets were now critically low at 32. This drop in platelets likely would have been prevented had the Heparin not been restarted by Dr. Crespo-Velez. The platelets and the ischemia in the extremities had stabilized following the initial bout of HIT from November 15 to November 20. Due to the continued use of Heparin by Dr. Crespo-Velez, Mr. Hernandez suffered HIT, as evidenced by the positive HIT test on November 30, and suffered worsening of his ischemia. Prior to November 26, there was only ischemia in the left lower extremity. On November 27, the ischemia was now present in bilateral lower extremities, which was likely due to the HIT caused by the Heparin ordered by Dr. Crespo-Velez on November 26. The HIT suffered by Mr. Hernandez also made the ischemia to the left upper extremity and left lower extremity worse. The treating physician stated that the initial ischemia was only in a few fingers, but after the HIT suffered on November 26, there was more extensive ischemia to the left hand and arm.

If the Heparin was not ordered by Dr. Crespo-Velez on November 26, it is likely that Mr. Hernandez would not have suffered the left arm and bilateral lower extremity amputations. The treating physicians stated on November 25 that only a left hand amputation was needed, but by December 1, there was a need for left arm amputation and bilateral foot amputations. The treating physician also attributed the worsening ischemia to HIT. The administration of Heparin, the drop in platelets, the positive HIT test, the worsening objective findings regarding ischemia after the Heparin, and the treating

rehearing, and this interlocutory appeal followed. *See id.* § 51.014(a)(10).

## II. DISCUSSION

### A. Applicable Law & Standard of Review

Under the TMLA, a plaintiff asserting a health care liability claim must serve each physician or health care provider defendant with a written expert report accompanied by the expert's curriculum vitae. *Id.* § 74.351(a). If a plaintiff fails to file an expert report within 120 days after the date each defendant's original answer is filed, the trial court must dismiss the claim with prejudice and award reasonable attorney's fees to the defendant. *Id.* § 74.351(b).[5]

> To comply with the statute, an expert report must
>
> provide[] a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). The goal of the statute is "to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Columbia Valley Healthcare Sys. L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 552 (Tex. 2011)). Therefore, "[a]n expert report . . . is a low threshold a person [bringing a claim] against a health care provider must cross merely to show that his claim is not frivolous." *Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012).

---

physician's opinions, are all objective evidence that Mr. Hernandez suffered HIT due to Dr. Crespo-Velez ordering Heparin, and this caused injury in the form of worsening of the ischemia and more extensive amputations. Had the Heparin not been started on November 26 and continued until November 28, it is likely that Mr. Hernandez would not have lost his feet and arm to amputation.

[5] The order on appeal does not award attorney's fees to Crespo-Velez.

A court should grant a motion challenging the adequacy of an expert report only if it appears to the court, after a hearing, that the report does not represent an "objective good faith effort to comply" with the requirements of an expert report as set forth above. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*). A "good faith effort" must provide enough information to (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). All information needed for this inquiry is found within the four corners of the expert report, and the report need not marshal all of the plaintiff's proof. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). If elements of a report are found deficient, "the court may grant one 30-day extension to the claimant in order to cure the deficiency." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c).

We review a trial court's decision on the sufficiency of an expert report for abuse of discretion. *Jelinek*, 328 S.W.3d at 539. A court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 911 (Tex. 2017).

## B. Adequacy of Original Report

In his objections and motion to dismiss, Crespo-Velez argued that Shuman's statements regarding the standard of care and causation were speculative and conclusory. As to the standard of care and breach, Shuman stated that Crespo-Velez and one other physician "apparently allowed" the administration of Heparin to continue "after

7

the angiogram on 11/27,"[6] and that "[i]t is a breach in the standard of care to use Heparin (3,000 u) during a procedure in someone who you highly suspect has HIT and has evidence of thrombosis." Crespo-Velez argued that these statements are "completely vague and speculative" because "there is no specific mention as to what specific days [Crespo-Velez] was involved after the angiogram on 11/27, what specific care he gave to Mr. Hernandez, and any orders given by him." As to causation, Crespo-Velez argued that Shuman's report "completely fails [to] state how [his] alleged care on 11/27/20 (1 day prior to Heparin being stopped) caused Mr. Hernandez'[s] amputation surgeries on 12/15 and 12/18."

We agree that Shuman's initial report was inadequate with respect to the causation element. Notwithstanding the fact that the TMLA speaks only of a "causal relationship" and does not refer to "proximate cause," the Texas Supreme Court has held that an expert report must explain how and why the defendant's breach *proximately* caused the plaintiff's injury. *Zamarripa*, 526 S.W.3d at 460 ("[A] plaintiff asserting a health care liability claim based on negligence, who cannot prove that her injury was proximately caused by the defendant's failure to meet applicable standards of care, does not have a meritorious claim."). Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013). For a negligent act or omission to have been a cause-in-fact of the harm, it must have been a substantial factor in bringing about the harm, and it must be shown that absent the act or omission, the harm would not have occurred. *Id.* Conjecture, guess, and speculation are insufficient to prove cause-in-fact. *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016).

---

[6] This is the only time Crespo-Velez's name is mentioned in Shuman's original report.

As Crespo-Velez argued in his motion to dismiss, the report states that the administration of Heparin was stopped on November 28, which is one day after Crespo-Velez "apparently allowed" it to continue. Shuman stated that, "[h]ad the surgical and cardiac teams properly stop[ped] the Heparin and given Argatroban earlier and avoided re-introducing additional Heparin, Juan would have had a less serious case of HITT and would not have had to undergo the serious amputations that he has sustained." However, Shuman acknowledged that, even if all caregivers had abided by the standard of care, Juan "might" still "have lost some fingers and toes." Appellant notes correctly that "there can be more than one proximate cause of an injury." *See, e.g.*, *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010). But in this case, at least four other physicians, as well as hospital staff, are alleged to have contributed to the improper administration of Heparin, and there is nothing in Shuman's original report specifying how or why Crespo-Velez's actions or omissions, in particular, were a substantial factor in causing Juan to suffer additional injury. The trial court could have determined that Shuman's original report contains no more than speculation in this regard.

To comply with the TMLA, an expert must "explain the basis of his statements to link his conclusions to the facts." *Jelinek*, 328 S.W.3d at 539. Because Shuman's report did not do so with respect to the causation element of the claim against Crespo-Velez, it did not "provide a basis for the trial court to conclude that the claims have merit." *See Miller*, 536 S.W.3d at 513; *Bowie Mem'l Hosp.*, 79 S.W.3d at 52. The trial court therefore did not abuse its discretion in sustaining Crespo-Velez's objections to the report on this basis.[7] Appellant's first issue is overruled.

---

[7] Because we conclude that the report was inadequate as to the causation element, we need not

## C.    Thirty-Day Extension

By her second issue, appellant argues the trial court erred by refusing to grant her a thirty-day extension to cure the deficiencies in Shuman's initial report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c). We review a trial court's ruling on a motion for a thirty-day extension under § 74.351(c) of the TMLA for abuse of discretion. *Henry v. Kelly*, 375 S.W.3d 531, 535 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *see Samlowski v. Wooten*, 332 S.W.3d 404, 412 (Tex. 2011) (plurality op.).

In general, "trial courts should err on the side of granting" claimants' requests for extension under § 74.351(c). *Samlowski*, 332 S.W.3d at 411. That is because "[t]he purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits." *Scoresby*, 346 S.W.3d at 554. In this regard, the Texas Supreme Court has distinguished between a deficient report and no report at all. *See Ogletree v. Matthews*, 262 S.W.3d 316, 319–21 (Tex. 2007). When "no report" is filed, the TMLA does not allow the trial court to grant an extension. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c); *Scoresby*, 346 S.W.3d at 556 (concluding that a statement by an expert that the defendant violated the standard of care and as a result caused damages, without more, warranted an extension rather than dismissal, but noting that a sheet of paper with "expert report" written on it "would mock the [TMLA]'s requirements" and constitutes "no report"). On the other hand, when a report contains deficiencies which "can be cured within the thirty-day period," the trial court "must" grant the extension. *Scoresby*, 346 S.W.3d at 549, 554.

---

decide whether it was also inadequate as to the standard of care and breach elements. *See* TEX. R. APP. P. 47.1, 47.4.

Appellant argues that, because any deficiencies in Shuman's report were curable, the trial court abused its discretion by failing to grant an extension. In response, Crespo-Velez contends that the trial court essentially "deemed Dr. Shuman's report to be 'no report' at all" and was therefore not authorized to grant an extension. In her reply brief, appellant notes that, though Crespo-Velez's motion ostensibly asked for dismissal of the suit, his counsel conceded at the April 6, 2023 hearing that a thirty-day extension would be proper in the event the court found the original report inadequate. She further observes that Crespo-Velez did not argue at the trial court, either in his motion or at the hearing, that Shuman's report constituted "no report" such than an extension would not be authorized. *See Thompson v. Fong*, 650 S.W.3d 164, 168 (Tex. App.—El Paso 2021, pet. denied) (finding, where appellant physician argued that suit should have been dismissed because reports were "so deficient as to not qualify as expert reports," that the issue was not preserved for appeal because appellant did not argue at the trial court that "the proffered reports were legally equivalent to no report").[8]

We agree with appellant that the trial court abused its discretion, given the specific circumstances presented here, by failing to grant an extension. Crespo-Velez does not dispute that Shuman was qualified to offer expert opinions as to the standard of care applicable to him or as to breach or causation. And on appeal, though Crespo-Velez insists that the trial court's failure to grant an extension was supported by its purported

---

[8] Appellant also emphasizes that the trial court appeared to grant her request for an extension at the hearing before signing an order which denied that request. In a civil case, when there is an inconsistency between a written judgment and an oral pronouncement of judgment, the written judgment controls. *In re K.M.B.*, 148 S.W.3d 618, 622 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Nevertheless, the trial court's apparent oral ruling, along with the rest of the hearing transcript, demonstrates that the issue of whether appellant would be entitled to an extension should the trial court find Shuman's original report deficient was not in dispute.

11

finding that Shuman's original report was "no report," he does not offer any substantive argument for why the trial court would have been justified in making that finding. Moreover, he does not explicitly argue that the deficiencies in Shuman's original report were not curable. We conclude that Shuman's initial report, though deficient with respect to the causation element, was not so deficient as to constitute "no report" at all. At the very least, the report implicates Crespo-Velez's conduct and demonstrates that, in Shuman's view, the claim against him has merit. *See Scoresby*, 346 S.W.3d at 557 (holding that "a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated").

In *Samlowski*, a plurality of the Texas Supreme Court explained the proper procedure for a claimant to follow in this situation:

> When, as in this case, the trial court simultaneously finds the expert report deficient, denies a motion to cure, and dismisses the underlying health care liability claim, the claimant must move the court to reconsider and promptly fix any problems with the report. This should further be done within the statutory, thirty-day period, thereby demonstrating that the report would have been cured had the extension been granted. If this is accomplished and the court refuses to reconsider, the now compliant report will typically establish the trial court's abuse of discretion.

332 S.W.3d at 411. Appellant followed this procedure in this case. Within the thirty-day period, she filed a motion for rehearing and served a supplemental report which contained far more detail regarding the standard of care applicable to Crespo-Velez, the alleged breach, and causation. Crespo-Velez does not argue on appeal that the supplemental report itself was inadequate or that it failed to cure the original report's deficiencies. In fact, he acknowledges that the supplemental report "goes into much greater detail about

12

[Crespo-Velez's] involvement" and alleges "for the first time" that Crespo-Velez treated Hernandez "both before and after the November 27 date listed in the original report."

We do not reach the issue of whether the supplemental report itself complied with the requirements of the TMLA; we merely hold that the trial court abused its discretion in refusing to grant one thirty-day extension under § 74.351(c) because the deficiencies in the initial report were curable. *See Scoresby*, 346 S.W.3d at 549, 554; *Samlowski*, 332 S.W.3d at 411. Appellant's second issue is sustained.

### III.    CONCLUSION

We reverse the trial court's judgment and remand with instructions to allow appellant one thirty-day period to cure the deficiencies in her initial expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c).

DORI CONTRERAS
Chief Justice

Delivered and filed on the
30th day of August, 2023.

13