

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00028-CV

**LAREDO TEXAS HOSPITAL COMPANY, L.P.** d/b/a Laredo Medical Center,
Appellant

v.

Zulema **CABRERA**, Individually and on Behalf of the Estate of David Cabrera, Deceased,
Appellee

From the 111th Judicial District Court, Webb County, Texas
Trial Court No. 2020-CVB-000897-D2
Honorable Monica Z. Notzon, Judge Presiding

Opinion by:    Beth Watkins, Justice

Sitting:       Irene Rios, Justice
               Beth Watkins, Justice
               Lori I. Valenzuela, Justice

Delivered and Filed: December 11, 2024

AFFIRMED

Appellant Laredo Texas Hospital Company, L.P. d/b/a Laredo Medical Center (LMC)

appeals the trial court's judgment in favor of appellee Zulema Cabrera. We affirm the judgment.

## BACKGROUND

On May 31, 2019, Zulema's husband, David Cabrera, underwent a tonsillectomy at LMC.

David's surgeon, Dr. Erik Sloman-Moll, saw bleeding in the back of David's throat during the

procedure, and he took several steps to address the bleeding. After he completed those steps,

Sloman-Moll saw a "flash" of blood that concerned him. He wanted to consult with LMC's interventional radiology department to examine—and, if necessary, repair—any injured blood vessels in David's throat, but the interventional radiologist had already left for the weekend.

Sloman-Moll testified that David was not bleeding at the conclusion of the surgery. However, to guard against the possibility of further bleeding over the weekend, Sloman-Moll packed David's mouth and throat with gauze, kept him intubated, and transferred him to LMC's intensive care unit. He also obtained a CT angiogram of David's neck and entered an order for an interventional radiology consult. Sloman-Moll testified that he later reviewed the CT angiogram with a radiologist and an interventional radiologist, but he also left the order for an interventional radiologist consult open because "I want him to stay on [interventional radiology]'s list in case this patient had a problem. . . . I want them available because I'm still worried about that patient." Sloman-Moll testified that he told the ICU nurses, "Don't erase that order."

David remained in the ICU from the evening of Friday, May 31 until Tuesday, June 4. Zulema testified that she saw blood dripping from David's face in the ICU. She also watched nurses clean blood from his mouth and place gauze under him "like that they didn't want the pillow to get dirty." When she asked about the bleeding, the nurses told her it was "something normal from the operation." Sloman-Moll, in contrast, testified there was no blood on the gauze he removed from David's mouth and throat, and LMC contends David's medical records show documentation of blood-tinged sputum, but not blood.[1] Sloman-Moll told the jury he did not see any injured arteries in David's throat when he removed the gauze packing, but "there was a suspicion that bleeding could reoccur." After Sloman-Moll removed the packing, he "called

---

[1] Sloman-Moll testified that sputum is "secretions that occur, primarily, in the lung," and he explained that intubation increases production of sputum and requires periodic suctioning of the intubated patient's endotracheal tube.

[interventional radiology] to let them proceed with their day," but he did not cancel or otherwise resolve the pending consult.

It is undisputed that David's hemoglobin levels, which indicate the health of red blood cells, dropped throughout his stay in the ICU. His pre-surgery hemoglobin level was 14.5, which was normal. His hemoglobin level dropped to 12.8 immediately after his surgery on May 31, then to 11.6 on Saturday, June 1. David's hemoglobin level was not checked on Sunday, June 2. His hemoglobin dropped to 8.8 on Monday, June 3, and then to 7.7 on Tuesday, June 4. Although LMC's internal policies defined a hemoglobin level under 8 as critical, David's hemoglobin levels were not checked again after June 4. At trial, Zulema's medical expert, Dr. Aaron Wittenberg, testified that David's falling hemoglobin levels were a sign of untreated internal bleeding.

David was transferred from the ICU to LMC's medical-surgical floor on June 4, five days after his surgery. Sloman-Moll's order for an interventional radiology consult was still in place. The next day, June 5, David began complaining of severe pain in his throat, and an LMC nurse administered intravenous morphine to treat this new pain. Sloman-Moll testified that he was still caring for David on June 4 and June 5, but his "notes [for those days] were not transcribed" and "[t]he documentation that was kept by the hospital was not scanned in."

At approximately 9:30 p.m. on June 5, LMC nurse Rejen Cobarde called Sloman-Moll to request a discharge order for David. At that time, Sloman-Moll was in the operating room performing surgery on another patient. Cobarde testified that although LMC ordinarily did not discharge patients at night, she asked Sloman-Moll to discharge David because David and/or Zulema asked to leave. Zulema disputed this and testified that nurses told her David was being discharged because the hospital "needed a bed." She also testified that she asked to see a doctor, but no doctor appeared prior to David's discharge.

David was still in severe pain when Cobarde asked Sloman-Moll to approve his discharge, and Cobarde gave him more intravenous morphine before he left the hospital. It is undisputed that Sloman-Moll's order for an interventional radiology consult remained open at the time of David's discharge and that David was never examined or treated by an interventional radiologist. Nevertheless, Cobarde marked the interventional radiology order as "completed" without asking Sloman-Moll about it. Cobarde testified that she "was not concerned" about sending David home with a critical hemoglobin level.

Zulema testified that after David came home from the hospital, he was "[w]eak and tired" and did not improve. Friends who visited David testified that he "was tired, he looked sick, he looked pale" and "was very quiet. Like, it was not David."

On June 14, 2019, David coughed, ran to the bathroom, and called out for Zulema. When Zulema arrived in the bathroom, "the sink was full of blood." David collapsed and "start[ed] to bleed out" in his wife's arms. Zulema's daughter called an ambulance, but Zulema believes David died before it arrived. David's death certificate identifies his cause of death as "exsanguination— or mass bleeding—following tonsillectomy . . . and that the interval that this had been occurring over was two weeks."

Zulema sued Sloman-Moll, alleging survival and wrongful death claims, and later amended her petition to add LMC and an ICU physician, Dr. Pradyumna Mummady, as defendants. During the jury trial, Wittenberg testified that he believed David died from a ruptured pseudoaneurysm in his throat that could have been prevented through examination and treatment by an interventional radiologist. A defense medical expert, Dr. Gilbert Ruiz, testified that he believed David died from a spontaneous delayed bleed, which he described as a known but unpredictable risk of a tonsillectomy. Sloman-Moll, testifying in his own defense, told the jury that he believed David

died from a spontaneous bleed, he did not believe LMC's nurses were negligent, and his treatment decisions were not influenced by anything the nurses did or failed to do.

When Zulema rested, the trial court granted Mummady's motion for directed verdict. The jury subsequently found LMC's negligence proximately caused "the occurrence in question"; Sloman-Moll's conduct was not a proximate cause of "the occurrence in question"; LMC was 100% responsible for "the occurrence in question"; and "the harm to David" was attributable to gross negligence. The jury found Zulema was entitled to recover actual damages "resulting from the death of David Cabrera" and exemplary damages. The jury also found David's estate was entitled to recover damages.

Zulema elected to recover solely on her wrongful death claim and voluntarily remitted the jury's awards of exemplary damages and future non-economic damages, a portion of the award for past non-economic damages, and the award of damages to David's estate. The trial court signed a final judgment on October 16, 2023, and Zulema subsequently remitted some of the court costs awarded to her. After the trial court denied LMC's post-judgment motions, LMC filed this appeal.

## ANALYSIS

### *Sufficiency of the Evidence*

In its first issue on appeal, LMC challenges the sufficiency of the evidence to support the jury's liability findings. LMC does not dispute that there is sufficient evidence to support a finding that it, acting through its nurses, breached the applicable standard of care. It argues, however, that Wittenberg's testimony was too conclusory or speculative to support findings that: (1) David died of a pseudoaneurysm; and (2) LMC's breaches proximately caused his death.

*Standard of Review*

When a party challenges the legal sufficiency of an adverse finding on which it did not have the burden of proof at trial, it must show there is no evidence to support the challenged finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). In considering this question, we view the evidence in the light most favorable to the verdict, "credit[ing] favorable evidence if reasonable jurors could, and disregard[ing] contrary evidence unless reasonable jurors could not." *In re Est. of Matthews*, 510 S.W.3d 106, 117 (Tex. App.—San Antonio 2016, pet. denied) (internal quotation marks omitted, alterations in original). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). "If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so, and we may not substitute our judgment for" the jury's. *Est. of Matthews*, 510 S.W.3d at 117 (internal quotation marks omitted).

When a party challenges the factual sufficiency of an adverse finding on which it did not have the burden of proof, it must show there is insufficient evidence to support the finding. *In re Matter of Marriage of Thrash*, 605 S.W.3d 224, 230 (Tex. App.—San Antonio 2020, pet. denied). We examine all the evidence, but we may not reverse the judgment unless "the evidence which supports the jury's finding is so weak as to be clearly wrong and manifestly unjust." *Flying J Inc. v. Meda, Inc.*, 373 S.W.3d 680, 690–91 (Tex. App.—San Antonio 2012, no pet.) (internal quotation marks omitted).

*Applicable Law*

Because Zulema's claims alleged medical malpractice, she bore the burden to prove "to a reasonable medical probability that the injuries complained of were proximately caused by"

LMC's negligence. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). "The two elements of proximate cause are cause-in-fact and foreseeability." *Pediatrics Cool Care v. Thompson*, 649 S.W.3d 152, 158 (Tex. 2022). The cause-in-fact prong "requires proof that (1) the negligence was a substantial factor in causing the injury, and (2) without the act or omission, the harm would not have occurred." *Gunn*, 554 S.W.3d at 658. The "defendant's act or omission need not be the sole cause of an injury, as long as it is a substantial factor in bringing about the injury." *Bustamante v. Ponte*, 529 S.W.3d 447, 457 (Tex. 2017).

The foreseeability prong requires a showing "that a person of ordinary intelligence would have anticipated the danger caused by the negligent act or omission." *Mariner Health Care of Nashville, Inc. v. Robins*, 321 S.W.3d 193, 205 (Tex. App.—Houston [1st Dist.] 2010, no pet.). The plaintiff is not required to establish "that the exact sequence of events that produced an injury [was] foreseeable." *Mason v. AMed-Health, Inc.*, 582 S.W.3d 773, 790 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (internal quotation marks omitted). "[O]nly the general danger must be foreseeable." *County of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002).

"In medical-malpractice cases, the general rule is that 'expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors.'" *Gunn*, 554 S.W.3d at 658 (quoting *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010)). "It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury." *Jelinek*, 328 S.W.3d at 536. An expert satisfies this requirement by explaining the factual basis for his opinions. *See Bustamante*, 529 S.W.3d at 462. "If no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is

no objection." *Id.*; *see also Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019) ("A conclusory statement asserts a conclusion with no basis or explanation.").

When called for by the evidence and the opponent's theory of the case, the expert must also "explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts." *Jelinek*, 328 S.W.3d at 536. However, the Texas Supreme Court has recognized "that in searching for truth, the law does not, and should not, require proof of an absolute certainty of causation or any other factual issue." *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 405 (Tex. 1993). "The line determining whether an expert opinion is conclusory is difficult to draw, and close calls must go to the trial court." *Windrum*, 581 S.W.3d at 770 (internal quotation marks and alteration omitted). "[W]hen the evidence falls within the zone of reasonable disagreement, the court may not substitute its judgment for that of the fact finder." *Id.*

*Application*

*Did Zulema Present Evidence of a Pseudoaneurysm?*

We begin by addressing LMC's contention that Wittenberg did not explain the factual basis for his opinion that David died from a preventable pseudoaneurysm. After reviewing the record, we conclude Wittenberg's testimony on this point was not conclusory or speculative and was legally and factually sufficient to support a finding that David died from a pseudoaneurysm. *See, e.g.*, *Windrum*, 581 S.W.3d at 770; *Bustamante*, 529 S.W.3d at 462.

As support for his opinions, Wittenberg relied on his experience as an interventional radiologist, as well as his review of David's medical records, the autopsy report and photos from David's autopsy, David's death certificate, the depositions of Sloman-Moll and LMC's nurses, and the report from defense expert Ruiz. *See Windrum*, 581 S.W.3d at 774–75 (noting expert's

opinion "was based on actual data," including his own experience). Wittenberg testified that his understanding of the surgery was, "A tonsillectomy took place; and, at the time of the surgery, there was bleeding, which was a result of an injury to the lingual artery."[2] He described a pseudoaneurysm as "the natural way that arteries react to" trauma and continued bleeding.[3] He testified a pseudoaneurysm forms when an inner layer of an artery does not heal properly and the artery's outer layer:

> sort of tries to contain the blood to prevent—to prevent the blood from, you know, continuing to leak out from the vessel. Then your body forms kind of a castle around that, which is contained in sort of like some clotted blood, some platelets, that sort of forms almost like a mesh scaffolding around that outer bulge of the pseudoaneurysm; and so, that's your body's kind of temporary way of getting the bleed to stop.

Wittenberg testified David's falling hemoglobin was a sign of internal bleeding:

> The hemoglobin was dropping every single time that it was checked in the ICU. That is an objective finding of ongoing bleeding. If your hemoglobin is decreasing every day, you are bleeding. . . . It's understandable that patients can lose blood during surgery . . . [but the difference between] the baseline hemoglobin of 14.5 and the first [post-surgery] hemoglobin 12.8, that is more than what you would expect for the tonsillectomy. . . . If you see an initial drop in the hemoglobin, but then it levels off and it stabilizes, that suggests that there was bleeding, but then that bleeding stopped; but, if you see hemoglobin continuing to trend down and go lower and lower and lower, that means that there's blood loss. There's bleeding going on somewhere.

Wittenberg added, "The hemoglobin trend over the course of the admission, that is consistent with a patient who's bleeding over those five days."

A defense nursing expert, Sharla Shumaker, similarly testified that "[g]oing from 14 to 7.7 is—is a decline and a loss in blood," and she agreed falling hemoglobin "is one of the indications" of bleeding. Likewise, Mummady agreed that the falling hemoglobin levels showed David was

---

[2] Wittenberg described the lingual artery as "at the back part of the mouth of the oral pharynx, sort of at the back part of the base of the tongue."

[3] Zulema testified that after the surgery was over, a doctor told her "that they had cut an artery."

losing blood.[4] While Shumaker testified, "There was no evidence of physical bleeding," she agreed "that the drop in hemoglobin is a consideration." Based on the evidence he reviewed, Wittenberg concluded, "The actively-bleeding artery that was evidenced by decreasing hemoglobin levels, critically abnormal vital signs, [David] continued to bleed; and, ultimately, that vessel formed a pseudoaneurysm. When it ruptured, it caused massive-acute exsanguination resulting in [David's] untimely death."

Wittenberg testified the throat pain David complained of on his last day in the hospital was also consistent with the formation of a pseudoaneurysm:

> [T]he throat] doesn't hold a lot of room for things like swelling; and, all of the nerve endings in there are very sensitive. So, if you develop even a small pseudoaneurysm in the back part of your throat, it would cause a lot of pain. . . . The pain at the back of the throat is consistent with the formation of pseudoaneurysm at that location.

Wittenberg further testified, "There is no other reason [than a pseudoaneurysm] for acute onset of pain five days after surgery."

Finally, Wittenberg testified that David's coughing before his death was "consistent with the pseudoaneurysm" because "the presence of a pseudoaneurysm in the back of the throat would be near to irritating. It can cause a coughing reflux." He added, "[W]hen you cough, it causes an entry pressure in the back of the throat, and that pressure could be enough to rupture the vessel." He also explained that after a pseudoaneurysm ruptures, "just fragments of a transected or a transected vessel[5] is all you'll see, because once that pseudoaneurysm ruptures, the entire artery loses all of its integrity." He showed the jury exactly that in David's autopsy photos: "You see the artery, and then when it gets to the point, where the [medical examiner's] glove is, there is no more

---

[4] Mummady later testified, "Dropping [hematocrit and hemoglobin] is mainly—most of the time because of bleeding, but sometimes it can be multiple other reasons."

[5] Although the parties did not explicitly define the term, the evidence would allow the jury to understand that a transected vessel is one that has exploded or disintegrated.

artery. That's where the vessel, basically, exploded disintegrated or exploded after the pseudoaneurysm ruptured."

LMC argues, however, that the evidence presented at trial either does not support or contradicts Wittenberg's conclusion that David died from a pseudoaneurysm. *See City of Keller*, 168 S.W.3d at 813 ("[I]f an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded."). First, LMC contends Wittenberg's theory required evidence that David experienced high blood pressure. As support for this assertion, it notes that Wittenberg testified the body's initial reaction to internal bleeding is that the affected artery "clamps down," or vasoconstricts, which causes the patient's blood pressure to increase. Because Wittenberg also testified that David's medical records show three instances of "critically-low blood pressure measurements," LMC contends his ultimate opinion is unsupported by the documentary evidence.

The record does not support LMC's contention. Wittenberg did not testify that internal bleeding or the formation of a pseudoaneurysm causes a sustained or persistent spike in blood pressure. To the contrary, he testified that "your body can only maintain that [increased blood pressure] for so long"; the formation of a pseudoaneurysm will temporarily stop internal bleeding; and "the vasoconstriction goes away" when bleeding stops. He also testified that active bleeding will eventually lead to a decrease in blood pressure and "when you have blood pressure levels that are critically low over the course of three consecutive hours"—as the medical records from June 3 show David experienced—"that's an objective sign . . . of a patient that's actively bleeding[.]"

Next, LMC argues there is no documentary evidence that David continued to bleed after the surgery. This is not correct; Shumaker testified the records contain a nurse's notation that David "coughed blood" on June 4. Furthermore, Wittenberg testified that any internal blood loss would

have gone to David's stomach, lungs, neck, or "the secretion in sputum that was suctioned out from his neck," and he noted David's medical records from June 4 and 5 showed "several notations by the nurse of medium-to-large quantities of blood-tinged sputum suctioned from the oral pharynx."[6]

Additionally, as noted above, Zulema testified that she saw blood dripping from David's face in the ICU and asked nurses about it. LMC argues Zulema saw "blood-tinged sputum," not blood, and it contends she "is not an expert witness and cannot discern the difference between blood and blood-tinged sputum[.]" But LMC cites no authority holding that an expert witness is required to identify blood—a bodily fluid that is within a layman's general experience and common knowledge. *See, e.g.*, *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006) (expert testimony is required on matters that are beyond a layman's "general experience and common knowledge"). Sloman-Moll testified that blood and blood-tinged sputum are visually distinct, noting that blood-tinged sputum has "a little bit of pink to it. Whereas blood has a thicker consistency, and it is more viscous and easy to distinguish." But, again, Zulema testified she saw David bleeding in the hospital, and the jury was free to credit that testimony. We reject LMC's suggestion otherwise. *See, e.g.*, *Est. of Matthews*, 510 S.W.3d at 117 (we may not disregard evidence that reasonable people could credit).

LMC also points to evidence that a process called hemodilution can cause falling hemoglobin even if there is no internal bleeding.[7] But Wittenberg did not believe David's medical records supported a finding of hemodilution. He explained that doctors "look at the hematocrit to hemoglobin ratio" to determine whether hemodilution has occurred, and that under normal

---

[6] Wittenberg described blood-tinged sputum as "blood and sputum mixed together." While LMC's witnesses testified that blood and blood-tinged sputum are distinct, Wittenberg testified LMC's documentation of the sputum "was very minimal" and did not show "how dark was it, how bloody was it, or what was the actual volume[.]"

[7] Wittenberg defined hemodilution as an increase in the overall volume of blood due to fluid intake.

circumstances, "[t]hat ratio should be approximately 3/1 hematocrit to hemoglobin." Both Ruiz and Mummady agreed that the hematocrit and hemoglobin should usually be a 3-to-1 ratio. Wittenberg testified a normal ratio is inconsistent with a finding of hemodilution because "if there is hemodilution where your blood is diluted, the hematocrit will decrease much more rapidly than the hemoglobin." Wittenberg testified that David's hematocrit and hemoglobin levels held a consistent 3-to-1 ratio and, as a result, "[t]here is no hemodilution[.]" He further noted that David's "input fluid versus the output of urine [was] nearly identical over the course of the stay. There's no times where there's been a massive influx of fluid without the corresponding output of urine." Wittenberg told the jury that without evidence of hemodilution, "The only possible cause of such a precipitous drop of hemoglobin over such a short amount of time is bleeding."

LMC next argues the evidence shows the bleeding that killed David occurred on the right side of his throat, but the bleeding Sloman-Moll saw during the operation was on the left. Wittenberg addressed this apparent discrepancy. He told the jury, "Dr. Sloman-Moll testified [during his deposition] that he wasn't sure which side the bleeding was coming from, for certain, and that he saw bleeding in both tonsillar fossas[.]"[8] While Sloman-Moll testified at trial that he saw intraoperative bleeding only on the left side, the jury could properly consider this inconsistency in deciding the credibility of his trial testimony. *See Cruz v. Mor-Con, Inc.*, 672 S.W.3d 175, 185 (Tex. App.—Tyler 2023, no pet.).

Wittenberg also testified there is significant "cross-filling" between blood vessels in the left and right sides of the neck, "where sometimes the right supplies left and left supplies right. So, you can have a lot of bleeding in one, or either side, that could be caused from only one vessel on one side[.]" He explained:

---

[8] The tonsillar fossa are small cavities in the back of the throat where the tonsils rest.

"Collateral circulation" is a normal thing that we all have in various parts of the body. That means that branches from arteries in the left and arteries in the right cross-fill, one side fills the other. That's why we're able to do these types of procedures where we block off arteries. . . . [B]ecause there are collaterals [in the neck], you can block off the main-feeding arteries to an area, but that tissue will not die.

Sloman-Moll disputed this explanation and testified "there was not a collateral flow" in the blood vessels in David's throat. However, he relied on the post-surgery CT angiogram to reach this conclusion. Wittenberg and Sloman-Moll disagreed about whether David's injured lingual artery could even be seen on that angiogram,[9] and both Wittenberg and the defense expert, Ruiz, testified that a CT angiogram is not ideal to evaluate smaller arteries like the lingual artery.[10] Furthermore, Sloman-Moll himself testified, "The tonsils are very vascular," with "4-to-5 major blood supply to them, and they [*sic*] are often collaterals between those 4 or 5 connections."

LMC also argues the medical examiner did not note any collateral circulation in the autopsy report. However, Wittenberg testified collateral circulation is "not something that you would make a notation of on an autopsy or even see on a CT [angiogram]. It's something that exists, and we see it on angiograms that we do every single day." Wittenberg told the jury, "[David] did have collateral circulation on that part of the body. Everybody has it." He explained that based on his experience as an interventional radiologist, he knows collateral circulation is what allows doctors in his field to "embolize vessels without destroying tissue."[11] He also explained that the face and neck differ from other parts of the body, such as the heart and brain, where "there's no collateral circulation" and doctors therefore cannot safely "block off arteries" like they can in the neck.

---

[9] The angiogram itself is not included in the appellate record.

[10] Wittenberg testified that a CT angiogram "doesn't assess the lingual artery for vascular damage for irregularities caused by trauma. You need a catheter angiogram done by an Intervention Radiologist to do that." Ruiz testified that "not everything shows on a CT angiogram" and that a CT angiogram "rules out any major vessel disruption[.] . . . When you know it's not a major vessel disruption, it's probably a smaller vessel."

[11] Wittenberg described embolization as a minimally invasive procedure that stops bleeding by injecting material to "block of[f] the artery."

LMC next argues Wittenberg "admitted that he did not know whether the pseudoaneurysm existed on the date of discharge." It suggests the pseudoaneurysm may have formed after David left the hospital and therefore would not have been detected by an interventional radiologist. As support, LMC relies on Wittenberg's deposition testimony where he answered "I don't know" to the question "[W]as the pseudoaneurysm present upon [David's] discharge from the hospital?" But he also testified at trial that he believed an interventional radiologist "more likely than not, would have seen the abnormal vessel" and repaired it. He further testified, as explained above, that David's symptoms during his hospitalization were consistent with the formation of a pseudoaneurysm. And, significantly, Sloman-Moll testified that he understood Wittenberg's trial testimony to be that the pseudoaneurysm formed at some point between June 4 and June 5—i.e., when David was still in the hospital. To the extent Wittenberg's trial testimony conflicted with his deposition testimony, the jury had the sole authority to resolve that conflict. *See Cruz*, 672 S.W.3d at 185.

LMC further argues the medical examiner did not find a pseudoaneurysm during David's autopsy, and Sloman-Moll testified he did not see a pseudoaneurysm in David's autopsy photos. As Wittenberg explained to the jury, however, the autopsy photos showed David's artery had "exploded" or "disintegrated." LMC does not identify any evidence that a pseudoaneurysm in an artery that had exploded or disintegrated would be visible in autopsy photos.

Finally, LMC argues Wittenberg did not adequately exclude the alternative theory of a delayed spontaneous bleed. *See Jelinek*, 328 S.W.3d at 536. Sloman-Moll testified that "sometimes, two weeks, or even three weeks [after a tonsillectomy], the patient bleeds profusely, severely, from a one- or two-millimeter blood vessel, and it is so fast that they can't get to the ER, and they can't do anything about it." Ruiz testified such a spontaneous post-surgery bleed can

occur "when the area that has been cauterized or controlled forms a little scab. The scab comes off, and the vessel underneath will bleed. It's something that is not rare after a tonsillectomy."

But while Sloman-Moll opined that the transected artery shown in David's autopsy photos was "consistent with a spontaneous bleed," neither he nor Ruiz explained how a "scab com[ing] off" and beginning to bleed would create enough pressure to wholly rupture the blood vessel. Wittenberg, in contrast, testified, "When a pseudoaneurysm forms, the actual hole in the wall of the vessel continues to grow so that, over time, the pseudoaneurysm sac is exposed to greater and greater pressure, and greater and greater blood volume until it actually ruptures." He testified, "The continuing decrease in hemoglobin in a patient who is continuing to bleed is not consistent with a patient who had surgery, healed normally, and then went out to spontaneously have a rupture two weeks later. It doesn't make any sense." He also explained that a pseudoaneurysm was the only plausible explanation "for acute onset of pain five days after surgery," and neither Sloman-Moll nor Ruiz controverted that testimony. Finally, Ruiz testified that "[t]he vast majority" of patients who experience a spontaneous delayed bleed do not die; that he had personally never had a patient die in that manner during his 40-year career as an ear, nose, and throat surgeon; and that it is "medically possible, but not probable" to die from a spontaneous delayed bleed. This testimony constitutes "verifiable medical evidence" to explain why Wittenberg's opinion was medically superior to LMC's competing theory. *See Jelinek*, 328 S.W.3d at 536.

After reviewing the record, we hold that Wittenberg did not rely on unexplained conclusions or "ask the jury to 'take his word for it'" that David died of a pseudoaneurysm. *See Windrum*, 581 S.W.3d at 769. "In addition to providing his resume and describing his experience, [Wittenberg] provided enough reasons" to support his opinion on that point. *See id.* at 770–71. We therefore overrule LMC's arguments to the contrary.

*Did Zulema Present Sufficient Evidence of Causation?*

LMC also argues Wittenberg's testimony was too speculative to support his opinion that LMC's nurses proximately caused David's pseudoaneurysm and subsequent death. Again, we disagree.

LMC first argues that Wittenberg conceded the nurses' breaches "did not cause the formation of the pseudoaneurysm." *See, e.g.*, *Gunn*, 554 S.W.3d at 658 (plaintiff must establish defendant's conduct was cause-in-fact of the injury). Wittenberg testified, however, that David's intermittent bleeding during his hospitalization—as reflected by his consistently falling hemoglobin levels—caused the pseudoaneurysm and that the bleeding would have been treated if the nurses had alerted their supervising nurses and physicians to David's hemoglobin levels. Wittenberg testified that nurses "should have an understanding of signs and symptoms of bleeding. They may not understand, directly, how that bleeding would be fixed; but, they would understand signs and symptoms of bleeding," including "critical drops in hemoglobin."

It is true, as LMC notes, that Sloman-Moll testified LMC's nurses reported the critical 7.7 hemoglobin level to him. But Wittenberg testified, "[A] nurse is an advocate for the patient; and, if something doesn't seem right from a nursing standpoint, there's a chain of command that they should follow in order to address that." He added that if a nurse notifies a doctor of a critically-low level and the doctor takes no action, "it's necessary for the nurse to talk to the Charge Nurse" and then to proceed up the nursing chain of command from there. Wittenberg's testimony on this point is consistent with LMC's internal policies, which state: "Possible life threatening conditions may be present when established ranges of laboratory critical test results are obtained. Quick treatment of the patient's physical condition is necessary."

Wittenberg testified that completing the interventional radiology consult would have not only detected and treated the continued bleeding but also prevented the formation of the pseudoaneurysm that caused David's death. He also tied the failure to complete the interventional radiology consult to the conduct of LMC's nurses:

> At the time of discharge, nurses are required to go through the chart and reconcile any open orders in order to allow a discharge to go forward; and, even at that time, that was the last chance to realize that there was an open Interventional Radiology consult that was never completed before the discharge actually occurred. So, at that point, Nurse Cobarde was sort of the last line of defense to get that Interventional Radiology consult done, to have seen that it was still an open order, before [David] was discharged; but, Nurse Cobarde failed [David] by completing the order that was never actually completed, instead of recognizing that it was an open order that needed to be completed and calling Interventional Radiology and notifying Dr. Sloman-Moll that his order for Interventional Radiology consult was still open at the time of discharge.

LMC argues that this causation testimony does not support the jury's liability finding because Sloman-Moll testified the nurses' conduct did not influence his treatment decisions. Relying on our sister court's opinion in *Methodist Hospital v. German*, 369 S.W.3d 333, 336 (Tex. App.—Houston [1st Dist.] 2011, pet. denied), LMC contends that when a treating doctor testifies that he would not have changed his course of treatment if he had received different or additional information from nursing staff, that testimony conclusively shows the nurses' conduct was not a cause-in-fact of the injury.

We do not believe *German* stands for such a wide-ranging principle of law. The challenged expert in *German* testified the appellant hospital's nursing staff should have detected—and alerted the plaintiff's treating doctors to—symptoms that he believed showed the plaintiff experienced an adverse reaction to a medication. *See German*, 369 S.W.3d at 340–41, 345–46. Similar to Sloman-Moll's testimony in this case, the treating doctors in *German* testified they were either already aware of the symptoms or would not have done anything differently if they had been aware. *Id.* at

347–49. Based on this testimony, the *German* court held that the challenged expert's opinion that the nurses' conduct proximately caused the plaintiff's injuries was based on "conjecture, guess, or speculation[.]" *Id.* at 349. The court noted that while "the jury could have disbelieved the treating doctors' testimony, [the plaintiff] still carried the burden of proving by a reasonable medical probability" that the nurses' conduct caused his injuries. *Id.* at 348.

We note, however, that none of the treating doctors who testified in *German* were defendants at the time of the trial in that case.[12] This is a critical factual distinction. The result LMC urges here would require us to hold that the testimony Sloman-Moll offered *in his own defense* was conclusive as to the cause of David's death and rendered Wittenberg's contrary testimony speculative as a matter of law. We decline to hold that a co-defendant doctor may unilaterally break the chain of causation arising out of a nurse's breach simply by declaring, in a lawsuit where his own actions are challenged, that the breach did not affect his treatment decisions.[13] To the extent *German* can be interpreted to lead to that result, we disagree with it.

Furthermore, "[t]he documentary record [in *German*] reflect[ed] that the doctors had all of the information they needed available to them[.]" *Id.* at 349. For several reasons, we cannot reach the same conclusion here. First, the documentary record in this case establishes that no one involved in David's care knew whether his hemoglobin levels continued to drop on his last day in the hospital. While Sloman-Moll testified he knew about the critical 7.7 hemoglobin level and it did not affect his decision-making, he did not testify that he would have been similarly unconcerned about any further drops in David's hemoglobin levels.

---

[12] "After settling with his doctors, [the plaintiff in *German*] proceeded to trial against the sole remaining defendant, The Methodist Hospital." *German*, 369 S.W.3d at 336.

[13] Relying on the Texas Supreme Court's 1975 decision in *Gregory v. Texas Employees Insurance Association*, LMC argues "the jury could not disregard Sloman-Moll's uncontradicted testimony about the facts" because he testified as both a fact witness and an expert witness and "[u]ncontradicted testimony of expert witnesses must be taken as true insofar as it establishes facts[.]" We do not interpret *Gregory* to require a jury to credit the factual assertions of a testifying defendant. *See generally* 530 S.W.2d 105 (Tex. 1975).

Second, Rebecca Ramirez, a nurse who cared for David on the medical-surgical floor on June 5, testified that she did not report David's new onset of throat pain to Sloman-Moll. Cobarde, who cared for David later that day, testified that she told Sloman-Moll about the throat pain, but she also agreed she did not record that report in David's medical records, testifying, "I can't put down every detail what I talked to." Based on this evidence, the jury could have rationally concluded the nurses did not alert Sloman-Moll about this symptom when he could have taken steps to address it.

Third, nothing in David's records indicated that the nurses asked Sloman-Moll about the pending interventional radiology order before David was discharged. Although Sloman-Moll personally entered the order and was therefore aware of its existence, the evidence showed Cobarde contacted him to request David's discharge late at night while Sloman-Moll was performing surgery on another patient. Zulema's nursing expert, Zimmerman, offered testimony that would have permitted the jury to conclude that fact was significant here:

> People don't always listen. They are distracted. They didn't understand what you were saying. There are many reasons why people may not respond appropriately initially, and you [nurses] need to re-approach[.] And then, if you are not given a response that you find satisfactory with your re-approach, then you are obligated— not suggested—but you are obligated to take additional action; and, the most common additional action is the [nursing] chain of command.

While Zimmerman was not qualified to testify on causation, both she and Shumaker, the defense's nursing expert, testified that a nurse's duty to a patient cannot be superseded by a hospital policy, by a doctor's order, or by a doctor's failure to act. And, as noted above, Wittenberg—who was qualified to testify on causation—testified the nurses should have "advocated" for David because they were his "last line of defense" to see that the interventional radiology consult was appropriately resolved before his discharge.

Finally, the plaintiff's own expert in *German* "conceded that [the plaintiff's] many symptoms and complications were consistent with diagnoses other than" the one he suggested. *German*, 369 S.W.3d at 348. This concession matched the testimony of the treating doctors, who told the jury the plaintiff's platelet counts were consistent with "a lot of alternative explanations" other than the one advocated by the plaintiff's expert. *Id.* at 347. Here, however, the jury heard sharply conflicting testimony about the cause of David's falling hemoglobin levels, and LMC did not present any evidence to controvert Wittenberg's testimony about the acute onset of throat pain that occurred on David's last day in the hospital. Accordingly, while the existence of "alternative explanations" was essentially undisputed in *German*, the same cannot be said in this case.

After reviewing the record, we conclude it shows Wittenberg "provided a basis for his opinion which was more than mere *ipse dixit*." *Windrum*, 581 S.W.3d at 770–71; *see also Bustamante*, 529 S.W.3d at 462. The jury could therefore "reasonably rely on [his] conclusions and decide which experts to give greater weight." *Windrum*, 581 S.W.3d at 774–75. We further hold that Wittenberg's testimony was legally and factually sufficient to support the jury's finding that the nurses' negligence was a substantial factor in bringing about David's death, that David would not have died but-for the nurses' negligence, and that a person of ordinary intelligence would have anticipated the danger caused by the nurses' negligence. *See Bustamante*, 529 S.W.3d at 468–72; *Mariner Health Care*, 321 S.W.3d at 210.

We therefore overrule LMC's first issue.

### Jury Charge Error

In its second issue, LMC argues the trial court erred in the submission of Questions 1 and 2 of the jury charge and Zulema therefore failed to obtain the findings necessary to recover under the Wrongful Death Act.

*Standard of Review and Applicable Law*

We review a trial court's submission of jury questions and instructions for abuse of discretion. *See, e.g.*, *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). The Texas Rules of Civil Procedure provide that a trial court "shall, whenever feasible, submit the cause upon broad-form questions." TEX. R. CIV. P. 277. The court's charge must include "such instructions and definitions as shall be proper to enable the jury to render a verdict." *Id.* "The trial court has great discretion in submitting the jury charge . . . subject to the requirement that the questions submitted must control the disposition of the case, be raised by the pleadings and evidence, and properly submit the disputed issues for the jury's deliberations." *Villegas v. Tex. Dep't of Transp.*, 120 S.W.3d 26, 37 (Tex. App.—San Antonio 2003, pet. denied) (internal quotation marks omitted).

*Application*

Question 1 asked: "Did the negligence, if any, of [Sloman-Moll and/or LMC] proximately cause the occurrence in question?" Question 2, which was conditioned on at least one "Yes" answer to Question 1, stated, "For each person you found caused or contributed to cause the occurrence in question, find the percentage of responsibility attributable to each[.]"[14] LMC argues that by submitting these questions with "the occurrence in question" instead of "the death of David Cabrera," the trial court permitted Zulema to recover without obtaining a jury finding on a required element of her wrongful death claim.

As LMC notes, the Texas Wrongful Death Act permits recovery only for "an injury that causes an individual's death." TEX. CIV. PRAC. & REM. CODE ANN. § 71.002; *Kramer*, 858 S.W.2d

---

[14] Both Question 1 and Question 2 identified Sloman-Moll and LMC as the only parties whose alleged negligence was at issue.

at 404. However, LMC has not cited any appellate opinions reversing a wrongful death verdict because the charge asked whether the defendant caused the "occurrence in question."

On this point, LMC primarily relies on the Texas Supreme Court's opinions in *Kramer v. Lewisville Memorial Hospital* and *Texas Department of Transportation v. York. See Kramer*, 858 S.W.2d at 403–04; *Tex. Dep't of Transp. v. York*, 284 S.W.3d 844, 848 (Tex. 2009) (per curiam). While both *Kramer* and *York* involved wrongful death claims, neither addressed the precise question at issue here. In *Kramer*, the Texas Supreme Court considered "whether Texas permits recovery for lost chance of survival" and held that neither the Wrongful Death Act nor the Texas Survivorship Statute supports such a claim. *Kramer*, 858 S.W.2d at 398. Here, in contrast, Zulema did not attempt to recover on a "lost chance of survival" claim. *Kramer* does not require the jury charge in this wrongful death case to use the phrase "the death of David Cabrera," instead of "the occurrence in question." *See id*.

In *York*, a premises liability case, the liability question submitted to the jury contained a special defect instruction, but not an instruction on ordinary premises defect. *York*, 284 S.W.3d at 846. The Texas Supreme Court held the plaintiff could not recover under a special defect theory because the road condition at issue was not a special defect as a matter of law. *Id.* at 845–48. It further held the plaintiff also could not recover under an ordinary premises liability claim because the charge did not ask the jury to consider the parties' knowledge of the road condition. *Id.* at 848. While *York* certainly stands for the proposition that a plaintiff cannot recover on a theory she did not submit to the jury, we do not believe its analysis mandates a conclusion that a trial court reversibly errs by submitting a liability question that contains the phrase "the occurrence in question" in a wrongful death case.

Our own exhaustive research located only two Texas opinions that address this question. In both cases, the reviewing court found no error in the charge.

In *Star Enterprise v. Marze*, the decedent, Windel B. Marze, died after a fall. 61 S.W.3d 449, 454 (Tex. App.—San Antonio 2001, pet. denied). The fall itself did not kill Marze; instead, he died from an infection caused by the surgery that treated the injuries he sustained in the fall. *Id.* While Marze was alive, he brought a premises liability suit against the owner of the premises where he fell; after his death, his survivors brought wrongful death claims against the property owner. *Id.* The court's charge instructed the jury to consider whether the property owner's negligence proximately caused "the occurrence in question," and the jury found it did. *Id.* at 455. Like LMC, the property owner in *Marze* argued the charge's use of "occurrence in question" omitted an element of the wrongful death claim. *Id.* at 455–56.

We concluded that although the property owner disputed its own negligence, it "offered no controverting evidence that Mr. Marze's death was caused by something other than" the injuries he suffered in the fall. *Id.* at 459. We held that under those circumstances, "the 'occurrence in question' and the 'death of Windel B. Marze' ha[d] virtually the same meaning," and "[a]s a result, the charge contained no error." *Id.* Here, while LMC presented evidence that David's death resulted from something other than its own negligence, Sloman-Moll testified "that if [David] hadn't had his tonsillectomy, that wouldn't have proceeded to have pseudotumor or ruptured blood vessel due to the tonsillectomy. There would be no trauma to cause that, and he probably would not have had that incident." Based on this testimony, the trial court could have relied on our prior analysis in *Marze* to conclude there was no meaningful difference between "the occurrence in question" and "the death of David Cabrera." *See id.*

Our sister court's opinion in *THI of Texas at Lubbock I, LLC v. Perea* also addresses the question at issue here. *See generally* 329 S.W.3d 548 (Tex. App.—Amarillo 2010, pet. denied). In *Perea*, as in this case, a patient's survivors brought wrongful death claims against a hospital based on the alleged negligence of the hospital's nurses. *Id.* at 555, 561–62. The liability questions in *Perea* asked the jury to determine whether the hospital's negligence proximately caused "the injury in question." *Id.* at 565. The hospital argued the liability question should have asked the jury to determine whether the hospital's negligence proximately caused "the death of" the decedent and that this purported error omitted a necessary element of the plaintiffs' wrongful death claim. *Id.* at 566.

The *Perea* court rejected this argument. The court first noted that the wording of the challenged question was consistent with the Texas Pattern Jury Charge, which provides "that '[i]n a case involving death, the word "death" *may* be used instead of "injury[.]"'" *Id.* at 569 (emphasis in original). The court recognized that while "the Texas Pattern Jury Charges are not 'law,' they are heavily relied upon by bench and bar and based on what the State Bar Committee perceives the present law to be." *Id.* (citing *H.E. Butt Co. v. Bilotto*, 928 S.W.2d 197, 199 (Tex. App.—San Antonio 1996), *aff'd*, 985 S.W.2d 22 (Tex. 1998)). The court explained:

> The trial court's charge instructed the jury that, absent a proper legal definition for a term, the jury should attribute the "meaning commonly understood" to the words in the charge. Given the facts of this case and the similarity in the meanings of the terms "injury" and "death," as a precipitant to damages, we cannot say that, as a matter of law, a reasonable juror would have been misguided by the trial court's instruction. *This is particularly so when the vast majority of the evidence at trial, both testimonial and documentary, was related to [the decedent's] manner of death*[.] . . . In fact, during the trial court's hearing on the jury instructions, THI's counsel affirmatively stated that "[t]he only evidence of injury is death."

*Id.* (emphasis added).

We find this analysis persuasive. Here, as in *Perea*, the record shows the trial court relied on the Texas Pattern Jury Charge in deciding to overrule LMC's objection. While the charge in this case used the phrase "occurrence in question" rather than the "injury in question" language used in *Perea*, we do not believe this distinction, standing alone, renders *Perea*'s analysis inapplicable here. Furthermore, like the *Perea* court, we believe it is significant that the evidence and argument presented at trial focused squarely on the cause of David's death. *See id.* On this record, we disagree with LMC's assertion that the jury might have been confused about the "occurrence in question" it was being asked to consider.

The *Perea* court also noted that "the answers sought by [the hospital] can be found in" the charge's damages questions, which "sought to establish damages resulting from [the decedent's] death." *Id.* at 570. The same is true here. While Questions 1 and 2 asked the jury to determine whether LMC proximately caused the "occurrence in question," Question 5—the only damages question upon which Zulema elected to recover—instructed the jury to limit an award of damages to those "resulting from the death of David Cabrera[.]"

In short, the only two cases we have found that address this specific issue are both contrary to LMC's position. Because we review jury charge error under an abuse of discretion standard, we cannot say the trial court behaved arbitrarily, unreasonably, or without reference to guiding rules by using "the occurrence at issue" instead of "the death of David Cabrera" in Questions 1 and 2. *See Hawley*, 284 S.W.3d at 856; *Marze*, 61 S.W.3d at 459; *Perea*, 329 S.W.3d at 570.

We therefore overrule LMC's second issue.

## CONCLUSION

We affirm the trial court's judgment. We render judgment against The Hanover Insurance Company, the surety on LMC's supersedeas bond, for performance of the judgment and costs taxed against LMC. *See* TEX. R. APP. P. 43.5.

Beth Watkins, Justice